McDUFFEE et al. v. HESTONVILLE, M. & F. PASS. RY. CO. et al.

(Circuit Court, E. D. Pennsylvania.   June 17, 1910.)

No. 45.

1. PATENTS (§§ 172, 178, 328*) — VALIDITY AND INFRINGEMENT — ELECTRICAL DISTRIBUTION SYSTEM FOR RAILWAYS.

The Schlesinger patent, No. 546,059, for a system of distribution of electricity for electric railways, claim 1, covers a combination which was not anticipated and discloses invention, and which was sufficiently shown in the application and drawings, although not appearing in any one of the original claims prior to their amendment.   The character of the invention, also, as a new, meritorious, and highly successful combination in the electric railway art, entitles the claim to a somewhat liberal construction and range of equivalents.   Also construed, and *held* infringed.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 247, 254½; Dec. Dig. §§ 172, 178.*]

2. PATENTS (§ 112*) — VALIDITY — ABANDONMENT OF APPLICATION.

The reinstatement of an application for a patent after several years, during which no action had been taken thereon, on a finding by the Patent Office that the delay was unavoidable within the meaning of Rev. St. § 4894 (U. S. Comp. St. 1901, p. 3384), is conclusive on the courts that the application was not abandoned.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 112.*]

3. PATENTS (§ 87*) — VALIDITY — ABANDONMENT OF INVENTION.

An abandonment of an invention after the filing of an application for a patent, upon which a patent was subsequently granted, must be established by clear proof showing an intention to abandon, especially where the invention is a meritorious and valuable one.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 112; Dec. Dig. § 87.*

Abandonment of invention, see note to Hayes-Young Tie Plate Co. v. St. Louis Transit Co., 70 C. C. A. 6.]

4. PATENTS (§ 83*) — VALIDITY — EFFECT OF DELAY IN PATENT OFFICE.

A patent cannot be defeated or limited by intervening rights of third persons applying for and receiving patents between the filing of the application and the issuing of such patent, where there was no abandonment of either the application or invention, and no expansion of claims, merely because there was delay in prosecution of the claims, which was satisfactorily explained to the Patent Office.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 83.*]

In Equity.   Suit by John I. McDuffee, trustee, and the Allis-Chalmers Company, against the Hestonville, Mantua & Fairmount Passenger Railway Company and the General Electric Company.   On final hearing.   Decree for complainants.

See, also, 158 Fed. 827.

C. V. Edwards, Thos. F. Sheridan, and Joseph C. Fraley, for complainants.

Charles Neave and Frederick P. Fish, for defendants.

BRADFORD, District Judge.   The patent in suit, No. 546,059, dated September 10, 1895, issued from the United States Patent Office to William M. Schlesinger, assignor to John I. McDuffee, Trustee,

for alleged improvements in electric railways. The suit is prosecuted by John I. McDuffee, Trustee, and the Allis-Chalmers Company, the present owners of the patent, against the Hestonville, Mantua & Fairmount Passenger Railway Company, the user, and the General Electric Company, the manufacturer and seller, of the alleged infringing railway apparatus or equipment. No question is raised as to title or such manufacture, sale and use. Schlesinger states in the description:

"My invention has relation to that form of electric railways wherein a line of conductors having generators located along the line of railway for feeding a current to and from end to end of the line or working conductors are used; and it has for its object to obtain safety of traffic or continuity of travel by preventing one or more electrical defects at any point on the line stopping the traffic or travel on the whole line or any extended portion of the same, thereby confining the fault to the smallest space or length of line possible, and to secure a better subdivision of the current to the different cars on the line."

The patent contains three claims of which only the first is in controversy. It is as follows:

"1. In an electric railway the combination of, a series of separate feeding conductors extending in multiple arc relation from one generator pole or terminal to points along the line of way, safety devices for said separate feeding conductors, a working conductor comprising a series of insulated or disconnected sections disposed along the line of way and supplied by said separate feeding conductors, and return circuit connections opposed to said sections and leading to the other generator pole, or terminal, substantially as described."

Fig. 3 of the patent which the complainants claim to be an embodiment of the invention as set forth in claim 1 is as follows:

Fig. 3

With respect to this figure Schlesinger states in the description:

"Fig. 3 is a like view showing one of the conductors composed of sections and separate feeding-conductors for one or more of the sections and their safety devices. * * * By providing separate feeding-conductors for one or more than one safety device and conductor-section c, as shown in Fig. 3, any amount of current may be supplied to the different cars on the line, and in the last-described construction any one of the separate feeding-conductors F forms a reserve wire for connecting it with any one of the other feeding-conductors in case of a breakdown or defect occurring therein, as shown at s. * * * Referring to Fig. 3, wherein there are separate feeders in multiple arc from one pole or terminal of the source of electrical energy, it is clear that the potentials or line-pressures may be made equal at all points along the line. Moreover, the current for all the cars that may be found in any one section is carried wholly over the feeder or feeders of that section, the feeders and working conductor of other sections being electrically independent of each other, and the working conductor itself may be of comparatively small size."

One great advantage obtained by the system of Fig. 3 lies in this, that the effects of several classes of accident on the line may be thus localized, and each feeder, being supplied with a switch of the above-described or of any preferred construction, may be thrown, for example, automatically out of or put in line at will, the other sections not being in any way affected thereby. If, then, the working conductor be broken at any point or if there be a short circuit to ground, the movement of the cars over the other sections need not be interrupted."

Schlesinger in describing the features of the combinations represented in one or more of the drawings of the patent in suit other than Fig. 3 uses language which is in part applicable to certain features comprised in the combination illustrated in Fig. 3, as follows:

"The conductors C C' have a generator D, as indicated. One of the conductors C is continuous and leads directly to one of the commutator-brushes of the generator, while the conductor C' is composed of disconnected sections c c, or sections insulated from one another, * * * and is not directly connected to the generator. Each such section is provided or is in circuit with an electric or current safety device E, of any suitable or desired kind, and these safety devices E are connected to a common or single wire or conductor F, which leads to the other commutator-brush of the generator. The conductors C C' are the working conductors, and with each the traveling brushes of the car contact. The safety devices E are so constructed and arranged that so long as the insulation or electrical condition of the conductor-sections c and conductor C continues perfect or no short-circuiting occurs between the sections c and wire or conductor C, the current passes from conductor F to such conductor-sections through their safety devices to maintain the line or working circuit intact and secure safety and continuity of traffic or travel throughout the line; but as soon as there is an electrical defect or faulty insulation in any one of the sections c and conductors C tending to short-circuit the line-current then the safety device for said section acts or is operated by the excess of current passing through it to break the circuit or connection between said section and the feeding-conductor F. When this happens said section is electrically cut out of the conductor C', or no current is supplied to said section, while all the other sections of said conductor are in circuit with the generator, providing their electrical condition is good. Hence cars upon the latter continue their travel irrespective of the cutting out of any of the bad sections of conductor C'. * * * In a railway constructed as above described it will therefore be noted that the sections of one or both working conductors are in multiple arc and any fault or defect in the electrical condition of a conductor-section causes it to be automatically cut out of the line or working circuit without affecting the circuit connections of any other section, the traffic or travel upon any other part of the line is not interfered with, and travel is only temporarily stopped upon the faulty section of the conductor C', and cars arriving at this section are moved over it by any suitable extraneous means to keep the travel or traffic safe and continuous."

The system of distribution of electricity for electric railways embodied in claim 1 and illustrated in Fig. 3 is undoubtedly of great merit and has proved eminently successful. It possesses marked features of economy, safety, convenience, and utility in other respects. It presents a combination in an electric railway comprising the following elements: First, a series of separate feeding conductors extending in multiple arc relation from one generator pole or terminal to points along the line of way; second, safety devices for the separate feeding conductors; third, a working conductor comprising a series of insulated or disconnected sections disposed along the line of way and supplied by the separate feeding conductors; and, fourth, return circuit connections opposed to the sections and leading to the other gen-

erator pole or terminal. The division of the working conductor along the line of way into a series of insulated or disconnected sections, supplied with electric current by separate feeding conductors from a common or unitary source of electricity, among other advantages, restricts within narrow limits the effect of electrical faults occurring in different sections of the line of railway and secures continued maintenance of travel over the other portions of the line, promotes economy not only by securing such uninterrupted travel, but through a reduction in the diameter and consequent cost of the working conductor, minimizes electrical "drop" in its practical results, and insures a proper distribution of electricity as between the different sections of the working conductor by furnishing them respectively, by means of the separate feeding conductors, which may consist of wires respectively of different diameter, with electric current of such power and so regulated as to meet varying electrical requirements for the propulsion of cars over all portions of the railway, notwithstanding change in grade as between different sections and congestion of travel over some one or more of them.

The defences set up are substantially that the combination of claim 1 of the patent in suit was anticipated; that the prior art negatives invention on the part of Schlesinger at or before the date of the application; that if claim 1 be valid it must receive a construction so limiting its scope as to negative infringement by the defendants; that the invention, if any, was abandoned; that the invention disclosed in the application is substantially different from the combination in question; and that the rights of third persons receiving patents for inventions made after the date of Schlesinger's application and before the date of the patent in suit cannot be affected by the granting of that patent.

It will be convenient first to consider whether the invention disclosed in the application is substantially different from that of the combination of claim 1. The combination of claim 1, it is true, does not appear in any of the claims contained in the application as originally filed by Schlesinger November 24, 1885. But this fact is not of itself determinative of the question whether that combination was not disclosed in the application and its accompanying drawings when considered as a whole. These drawings are identical in every particular with the drawings of the patent in suit and in connection with the descriptive portion of the application they show a combination for an electric railway comprising every element contained in the combination of claim 1. They disclose in an electric railway a combination of a series of separate feeding conductors extending in multiple arc relation from one generator pole or terminal to points along the line of way, safety devices for the separate feeding conductors, a working conductor comprising a series of insulated or disconnected sections disposed along the line of way and supplied by the separate feeding conductors, and return circuit connections opposed to the sections and leading to the other generator pole or terminal. The combination was defectively and insufficiently described, its operation was in some respects erroneously stated, and the various claims were inartificially drawn or too broad to be allowed in view of the prior art. These imperfections could be remedied only by appropriate amendments made in the or-

derly prosecution of the case in the Patent Office; and the correction of such defects in the description of and claims for a meritorious invention is one of the principal aims the practice and procedure of that office were established to accomplish. It appears from the file wrapper and contents of the patent in suit that Schlesinger in the application as originally filed referred to the first three drawings as follows:

"Fig. 1, is a diagram showing line of railway and cars, a generator, a continuous line conductor, a sectional line conductor and safety devices with a common feeding conductor, embodying my invention. Fig. 2, is a diagram of generator and line conductors, showing both conductors composed of sections, each having a safety device and feeding conductors. Fig. 3, is a like view showing one of the conductors composed of sections and separate feeding conductors for one or more of the sections and their safety devices."

His reference to Fig. 4 is not material in this connection. In the descriptive portion of the application he makes, among others, the following statements:

"By providing separate feeding conductors for one or more than one safety device and conductor section c, as shown in Fig. 3, the same amount of current but of different electro-motive force may be supplied to the different cars on the line, and in the last described construction any one of the separate feeding conductors F forms a reserve wire for connecting it with any one of the other feeding conductors in case of a breakdown or defect occurring therein, as shown at s. I do not confine my invention to any particular kind of safety device as it may be of an electro-magnetic, a fusible strip, or other well known construction of same, neither do I limit myself to the number or to the length of the sections composing the conductors, nor to dividing one or both line conductors into sections nor to the manner of connecting the safety devices to the generator, as it is obvious that the same may be numerously varied without departing from the spirit of my invention."

The application contained nine claims, of which the seventh, relating to the detailed construction of the safety device shown in Fig. 4, appears as claim 3 in the patent as finally granted. All the other claims were too broad or otherwise defective and were disallowed. Careful examination of the file wrapper and contents has satisfied me that the essence of the invention embodied in the combination of claim 1 of the patent in suit had been conceived by Schlesinger prior to the date of his application as originally filed, and that such combination, while defectively claimed and in some respects inadequately described, was correctly illustrated by Fig. 3 which the inventor considered as embodying its best form. In that combination as appears from the application as originally filed, each of the disconnected or insulated sections of the working conductor is provided with an electrical or current safety device which is in circuit with a feeding conductor connected with one pole of the generator; there is a plurality of such feeding conductors separately and respectively leading to different portions of the line of railway; each of such separate feeding conductors is connected or in circuit with one or more of the safety devices and consequently with one or more of the disconnected or insulated sections of the working conductor; there are return circuit connections opposed to the disconnected or insulated sections and leading to the other pole of the generator; the separate feeding conductors, as shown in Fig. 3, which is identical with Fig. 3 of the patent in suit, are in multiple arc relation from the generator pole, receiving

their current respectively from a unitary supply of electricity, which automatically distributes itself among the conductors. Schlesinger particularly pointed out the advantage, as he thought, resulting from "providing separate feeding conductors for one or more than one safety device and conductor section c as shown in Fig. 3." That a unitary or common source of electricity for the separate feeders was and is plainly disclosed by Fig. 3 is beyond dispute. Mr. Buckingham in his cross-examination of Gharky, an expert for the complainants, relative to Fig. 3, said:

"How would you get different potentials from the generator here shown? As I understand it this generator has but one pair of brushes, which are connected to all of the feeders." (Rec. Vol. 7, p. 337.)

Morton, an expert witness for the defendants, in reply to the question, "What do you understand to be the supposed invention described in said patent and specially referred to in the first claim thereof?" stated the following as one of the elements of the combination:

"Second, the employment of a single or unitary source for the generation of the electric current from which the various feeding conductors are to be led, as distinguished from the employment of many separate sources, not electrically united with one another, and with all the feeding conductors."

He then added:

"All these elements and their combinations are well shown in Fig. 3 of the patent in suit." (Rec. Vol. 2, pp. 811, 812.)

As already stated, Fig. 3 of the patent in suit is in all respects identical with Fig. 3 of the application as originally filed. In the application as originally filed Schlesinger stated that among the objects of his invention was the securing of "a better subdivision of the current to the different cars on the line, and to feed to them the same amount of current but of different electro-motive force if necessary," and that under the arrangement illustrated in Fig. 3 "the same amount of current but of different electro-motive force may be supplied to the different cars on the line," while in the description of the patent as granted he said that under that arrangement "any amount of current may be supplied to the different cars on the line," and also "referring to Fig. 3, wherein there are separate feeders in multiple arc from one pole or terminal of the source of electrical energy, it is clear that the potentials or line-pressures may be made equal at all points along the line." The variation between the statements in the application as originally filed and the description of the patent as granted touching potentials, line-pressures and electro-motive force, are wholly unimportant, in view of the fact that both in the application as originally filed and in the patent description Fig. 3 shows a unitary and common source of electricity to supply the various separate feeding conductors, and the arrangement therein disclosed was capable of feeding different potentials to the various sections of the working conductor respectively, or a uniform potential to all of them, by means of resistances or feeder equalizers, variation in diameters or other devices, which were well known. The drawings and description of the application as originally filed clearly suggested claim 1 as finally allowed in the patent in suit; and it was not only the right of Schlesinger, but his duty, in the prose-

cution of the case through the Patent Office, by amendment to limit his claims to his real invention, correct inaccuracies in the descriptive portion of the application, and secure correspondence between the claims, the description and the drawings. Whether Schlesinger did or did not during the prosecution of his application in the Patent Office borrow some of the mere phraseology of the description of the patent in suit from the book of Crosby & Bell on 'The Electric Railway, published in 1893, is immaterial.

In the application as originally filed Schlesinger stated:

"Again while I have shown my improvements applied to an electric railway I do not wish to be considered as confining myself thereto, as they may be used as a circuit for any translating media."

And a number of the original claims are not confined to an electric railway. The above statement, however, and all such claims, were stricken out before the patent in suit was granted. The fact that the original specification was too broad in including "any translating media" affords no reason why the claims and description should not be restricted, as they have been, to an application of the system to electric railways. The conclusion reached on this branch of the case is that the invention embodied in the combination of claim 1 and illustrated in Fig. 3 is substantially the same as that for the patenting of which the application as originally filed was made.

As to anticipation but little need be said. That defence which was set up in the answer appears to have been abandoned. In their brief of argument the counsel for the defendants state that the defences to claim 1 are:

"That the claim is absolutely invalid in view of the prior art, and in view of the circumstances under which it was, at a late date, inserted in the application which resulted in the patent in suit; and the claim is not infringed upon any proper construction of that claim."

The expert Jenks, a witness for the defendants, says:

"I do not find among the references I have noted a description or illustration of this precise arrangement; namely, one safety device on each of two or more feeding conductors, or one safety device on each branch of each of two or more feeders, as illustrated in Fig. 3 of the drawings of the patent in suit."

Nor does the record disclose, so far as I can find, any anticipation, by patent or other matter, of the combination of claim 1.

Much stress, however, has been laid on the prior art as negativing invention on the part of Schlesinger with respect to the combination in question, and reference is made to numerous patents, printed publications and devices in support of the contention. It is urged that the present case "involves only those things which railway and lighting systems have in common." It is undoubtedly true that each of the elements composing the combination was old; and if claim 1 included merely an aggregation in contradistinction to a combination of those elements, the claim could not be sustained. But such is not the fact. That claim presents a true combination, and not a mere aggregation. Its patentability is sustainable on the recognized principle well expressed by Judge Sanborn in National Hollow B. B. Co. v. Inter-

changeable B. B. Co., 106 Fed. 693, 706, 707, 45 C. C. A. 544, 557, 558, that:

"A new combination of old elements, whereby a new and useful result is produced, or an old result is attained in a more facile, economical, and efficient way, may be protected by patent as securely as a new machine or composition of matter."

Coupled with the prima facie presumption of the validity of claim 1 arising from the granting of the patent, the great success which has attended the introduction of the system represented by the combination of that claim, the fact that the requirements of distribution of electricity are in the case of a system of electric railway in some respects here material different from those in the case of an electric lighting system, and the further fact that eminent inventors engaged at the same time in the art of electrical distribution as applied to electric railways and also to lighting systems had failed prior to the application for the patent in suit to supply the want so fully met by that combination, afford pursuasive and controlling evidence of its patentability. The scope of claim 1 will be hereinafter considered in connection with the question of infringement.

It is insisted, in substance, by the defendants that if Schlesinger was the first inventor of the combination of claim 1, it was abandoned to the public. It appears from the file wrapper and contents that from October, 1887, until November, 1894, no proceedings were had in the Patent Office in the prosecution of the application for the patent in suit. Section 4894, Rev. St. (U. S. Comp. St. 1901, p. 3384), as it existed prior to the granting of the patent in suit, was as follows:

"All applications for patents shall be completed and prepared for examination within two years after the filing of the application, and in default thereof, or upon failure of the applicant to prosecute the same within two years after any action therein, of which notice shall have been given to the applicant, they shall be regarded as abandoned by the parties thereto unless it be shown to the satisfaction of the Commissioner of Patents that such delay was unavoidable."

In this case it appears that it was shown to the satisfaction of that officer that the delay in prosecuting the application after October, 1887, was unavoidable. In November, 1894, a petition to the Commissioner of Patents was filed to revive the application on the ground that one Van Stavoren, the attorney charged with its prosecution, had from time to time given assurances upon which reliance was placed that proper attention was being bestowed upon the case, and that he was "by reason of overwork and other causes incompetent to attend to business." The petition was granted by the Acting Commissioner December 10, 1894; he stating that:

"In view of the peculiar circumstances of this case, especially of the fact that the former attorney was insane, it is thought that the failure to prosecute was unavoidable."

This action was reversed January 8, 1895. Within a few days thereafter one Van Horn made affidavit setting forth with considerable detail the unbalanced mental condition of Van Stavoren and stating that his "mental ailment was very gradual and insidious," and its continuance from 1889. McDuffee, also, one of the complainants, made af-

fidavit strongly tending to account for and justify the delay. A petition· for a reconsideration of the decision of January 8, 1895, that the application had been abandoned, was filed, which was granted by the Assistant Commissioner February 1, 1895, he making the following statement:

"The affidavits presented state in substance that it was believed that the mental disease of the former attorney began in the early part of 1886, and continued in a more or less aggravated form until about the time of his death in 1894, and that the knowledge of the abandonment of the application was not obtained by the applicant until after said attorney's death. I think, therefore, that under the circumstances the delay, although of so long a duration, may properly be termed 'unavoidable.' The petition is granted."

This finding is conclusive upon this court and establishes the fact that the application for the patent in suit had not been abandoned. An abandonment of an application for a patent is one thing and an abandonment of the invention which the application seeks to have patented is another. And the defendants urge that, notwithstanding the action of the Patent Office justifying the delay in the prosecution of the application, the invention embodied in the combination of claim 1, as finally allowed, was abandoned. A patentable invention may be abandoned actually or constructively. With the subject of constructive abandonment the court has nothing to do in this case. Generally speaking, an actual abandonment of the invention may be by express declaration or by circumstances evincive of an intention to abandon. No express abandonment of the invention embodied in the combination of claim 1 has been shown. If there was an actual abandonment in or after October, 1887, it must rest upon circumstantial evidence clearly establishing the fact. No room should be left for substantial doubt on the point. Especially is this true in view of the meritorious character of the invention and the facts that until October, 1887, all due diligence was observed in prosecuting the application and that no conceivable reason appears why the invention should have been abandoned at or after that time. In McMillin v. Barclay, Fed. Cas. No. 8,902, Judge McKennan in dealing with this subject said:

"Nor has the second branch of the defense, that the invention was actually abandoned, any better foothold. This must result from the intention of the patentee, expressly declared, or fairly indicated by his acts. There is certainly no evidence in the case of any express declaration of the patentee to that effect; and, if the lapse of years between the date of his application and of his patent, and his own conduct, can be fully explained upon any other hypothesis, they ought not to be imputed to an intention on his part to abandon his invention. The proof of actual abandonment, after application filed, ought to be indubitably clear. It ought not to rest upon doubtful or disputable inferences."

Here the record does not disclose any actual intention to abandon or any act or declaration of abandonment or any consent to the appropriation or use by others of the invention. In the absence of any evidence of a positive intention to abandon, I find it impossible to reconcile the fact, conclusively established by the decision of the Commissioner of Patents, that the application for a patent for the invention was not abandoned, with any theory that the invention must be presumed from the explained and justified delay to have been aban-

doned. The conclusion reached on this branch of the case is that the invention embodied in claim 1 of the patent in suit was not at any time abandoned.

The proposition advanced by the defendants that intervening rights of third persons receiving patents for inventions made after the date of Schlesinger's application and before the date of the patent in suit cannot be affected by the granting of that patent will now be considered. In Railway Co. v. Sayles, 97 U. S. 554, 563, 24 L. Ed. 1053, the court said:

"The law does not permit such enlargements of an original specification, which would interfere with other inventors who have entered the field in the meantime, any more than it does in the case of reissues of patents previously granted. Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has, in the meantime, gone into public use."

But this doctrine has, in my judgment, no application to the case in hand. There was no attempt to enlarge the scope of the application as originally filed. It is true that before 1895 no claim specifically mentioned in terms a unitary or common source of electrical supply for the separate feeding conductors. But such unitary or common source was clearly indicated by Fig. 3 in connection with the description portion of the application as originally filed, and was covered by two or more of the broad claims, objectionable as they were on account of their generality, in that application. With respect to safety devices the application as originally filed contains precisely the same statement found in the application as it now stands, namely:

"Neither do I limit myself to * * * the manner of connecting the safety devices to the generator, as it is obvious that the same may be numerously varied without departing from the spirit of my invention."

In striking out of the description the sentence, "Again while I have shown my improvements applied to an electric railway I do not wish to be considered as confining myself thereto as they may be used as a circuit for any translating media," far from broadening, he narrowed his patent application. In Hobbs v. Beach, 180 U. S. 383, 21 Sup. Ct. 409, 45 L. Ed. 586, where suit was brought by Beach for infringement of a reissue patent and one of the defences was that the claims of the patent had been "unlawfully expanded pending the litigation in the Patent Office," and it appeared that before the patent was finally reissued a patent had been granted to Horton covering features of the same invention, the court, referring to Railway Co. v. Sayles, said:

"Had there been any expansion of the original specification and claims subsequent to the introduction of the Horton machine, especially if made with reference thereto, we should not have hesitated to apply the doctrine of that case, but we see no evidence of an intent to cover that machine, unless it were already covered, and agree with Judge Lacombe, that 'the original drawings and specifications suggest the claims finally made, which recognize and claim the two different operations of outside and inside applications.' "

I perceive no ground on which the doctrine of "intervening rights" successfully can be invoked to destroy or affect the patent in suit. Neither the application nor the invention was abandoned, there was no

expansion of claims, nor was there anything done by Schlesinger or those representing him to deceive or mislead the public. There was merely the lapse of time which has been accounted for.

The question of infringement remains for consideration. For convenience Fig. 3 representing an embodiment of the combination of claim 1 of the patent in suit, and a drawing of the apparatus of the defendants complained of, are here inserted.

Fig. 3

The language of claim 1 accurately applies to the combination of the alleged infringing arrangement. The latter shows the combination in an electric railway of (1) a series of separate feeding conductors F F F F extending in multiple arc relation from one generator pole or terminal, f, to points along the line of way; (2) safety devices, E, for said separate feeding conductors; (3) a working conductor comprising a series of insulated or disconnected sections c c c c, disposed along the line of way and supplied by said separate feeding conductors; (4) return circuit connections C opposed to said sections and leading to the other generator pole or terminal, f'. It is contended by the defendants that the safety devices in the combination of claim 1, on the assumption of its validity, must be placed between the separate feeding conductors and the sections of the working conductor with which they are electrically connected; that the safety devices in the defendants' arrangement are not so placed; and hence that the defendants have not infringed. In the defendants' arrangement the operation by reason of an abnormal flow of electric current or otherwise of any one of the safety devices E will cut out of circuit only the particular section of the working conductor with which the separate feeding conductor carrying that safety device is electrically connected. In the arrangement shown in Fig. 3 of the patent

in suit the operation of any one of the safety devices will cut out of circuit only the particular section of the working conductor with which that safety device is electrically connected; but the separate feeding conductors are not limited respectively to only one safety device and its section of the working conductor. While in the defendants' arrangement each of the separate feeding conductors F is connected with only one section of the working conductor, in Fig. 3 each of the five separate feeding conductors, excepting the fifth and lowest, is electrically connected with two sections of the working conductor, the fifth and lowest being connected with only one section. With respect to this last feeding conductor the counsel for the defendants say:

"The illustration of one feeder feeding only one section at the right of Fig. 3 was clearly purely accidental and apparently is due to the fact that there was no room on the paper on which to show two sections."

They also urge that claim 1 reads on Fig. 3 after the elimination of the long feeder connected with only one section of the working conductor. It is true that after such elimination claim 1 would read on Fig. 3; but it is equally true that such claim reads on that figure without such elimination. And it is, moreover, true that such claim would read on Fig. 3 if so modified as to show all the separate feeding conductors electrically connected respectively with only one section of the working conductor. Further, the description taken as a whole shows that the connection of the long feeder in Fig. 3 with only one section of the working conductor was not accidental, but intended to illustrate one of the most important features of the system covered by claim 1. In the description of the application as originally filed, as well as in that of the patent as granted, it is stated that the object of the invention is, among other things, "to obtain safety of traffic or continuity of travel by preventing one or more electrical defects at any point on the line stopping the traffic or travel on the whole line or any extended portion of the same." In the application as originally filed Schlesinger further said:

"I divide one or both of the line conductors into sections which are disconnected or insulated from one another, and provide each section with an electrical or current safety device which is in circuit with a feeding wire or conductor common to all said safety devices, or, one or more of the safety devices may have separate feeding conductors. My invention accordingly consists of a line of conductors one or both of which consist of insulated or disconnected sections, a safety device for each section, and a common or separate conductor for all or any of the safety devices."

He also referred to the advantage of "providing separate feeding conductors for one or more than one safety device and conductor section c as shown in Fig. 3." The description of the patent as granted contains the following statement:

"I divide one or both of the line conductors into sections which are disconnected or insulated from one another and provide each section with an electrical or current safety device which has a separate conductor. My invention accordingly consists of a line of conductors one or both of which consist of insulated or disconnected sections, a safety device for each section, and a separate feeding-conductor for all or any group of the safety devices and of the improvements hereinafter described and claimed."

There, also, as in the description of the application as originally filed, reference is made to the advantage of "providing separate feeding-conductors for one or more than one safety device and conductor-section c as shown in Fig. 3." In view of the explicit statements in the original description that each of the disconnected or insulated sections is provided with a safety device; that one or more of such devices may have separate feeding conductors; that there is a common or separate conductor for all or any of the safety devices; and that separate feeding conductors for one or more than one safety device and conductor section c, as shown in Fig. 3, were desirable, it cannot seriously be questioned that claim 1 of the patent in suit if accompanied by the above statements in the original description would accurately read on Fig. 3, including the longest feeding conductor F, as well as the rest. For it must be borne in mind that the inventor, in using the words "common or separate conductor for all or any of the safety devices," used them with reference to the different arrangements represented by the several drawings filed with the application. They must, therefore, be taken distributively, and as applied to the arrangement of Fig. 3 be restricted to a "separate conductor for * * * any of the safety devices." Nor can a fair consideration of the description and drawings as a whole of the patent as granted fail to produce a conviction that claim 1 covers the arrangement illustrated in Fig. 3, including separate feeding conductors respectively connected with only one section or safety device as well as those connected with more than one. It must be conceded that some of the phraseology of the description, if not modified or qualified by other portions would raise grave doubt whether claim 1 covers the long feeding conductor connected with only one safety device and section as shown in Fig. 3. For reference is made to "a safety device for each section and a separate feeding-conductor for all or any group of the safety devices" as constituting part of the invention. This language taken alone, while applicable to the four feeding conductors each of which is connected with a group of two safety devices, seems to be inapplicable to the feeding conductor connected with only one such device. But the above quoted statement cannot be taken alone. It must be read in connection with other parts of the description which are explicit; and when so read all doubt is removed. Fig. 3, as illustrating the invention, is referred to both in the application as originally filed and in the description of the patent as granted, as showing "separate feeding-conductors for one or more of the sections and their safety devices," and reference is also made, as before stated, to the advantage of "providing separate feeding-conductors for one or more than one safety device and conductor-section c as shown in Fig. 3." Claim 1 must, therefore, be held to cover a combination in which the feeding conductors are severally and respectively connected with only one safety device and section of the working conductor as illustrated by the longest conductor F in Fig. 3.

Schlesinger states:

"Neither do I limit myself to the number or to the length of the sections composing the conductors, nor to the dividing one or both line conductors into sections, nor to the manner of connecting the safety devices to the generator,

as. it is obvious that the same may be numerously varied without departing from the spirit of my invention."

The defendants lay some stress upon the fact that during the course of the proceedings in the Patent Office Schlesinger in certain proposed amendments of the application for the patent in suit, described "safety devices connecting the working conductor sections and the feeding conductors therefor" and claimed "a safety device between each section and its feeding conductor," or "a normally closed safety device between each said section and a feeding conductor." These proposed amendments, if allowed, would have resulted in claims narrower than those contained in the application as originally filed or in the patent in suit as granted. They were rejected, however, and cannot serve to limit the scope of the patent to the precise form suggested by them. In the arrangement shown in Fig. 3 two safety devices with their respective sections of the working conductor are electrically connected with the first or highest separate feeding conductor F. If these two safety devices were eliminated, and another placed in the separate feeding conductor at any point between the pole of the generator and the first branch conductor leading to the first section, by the operation of the safety device so placed not only one but two sections would be cut out of circuit. A similar statement is applicable to each succeeding couple of safety devices connected with a single feeding conductor. It is, therefore, evident that while the operation of any safety device in the defendants' arrangement cuts out of circuit only one section of the working conductor, the operation of any safety device substituted in the separate feeding conductor for a couple of safety devices connected respectively with two sections as shown in Fig. 3 would cut out of circuit both those sections. But the longest and lowest separate feeding conductor F shown in that figure is connected with only one safety device and section of the working conductor. If that safety device should be removed from its position in the figure and placed in its separate feeding conductor at any point between the generator pole and the branch conductor its operation would result, as does the operation of any one of the defendants' safety devices, in cutting out of circuit only the particular section with which such separate feeding conductor is connected.

In a patent such as that in suit the monopoly is not restricted to the precise form of the mechanism or arrangement shown by the drawings illustrating an embodiment of the invention, unless the patentee has so limited his claim expressly or by necessary implication. Here, there is no such limitation, express or implied. The inventor sets forth in Fig. 3 in connection with the description the best mode contemplated by him of applying the principle of his invention. This was all the law required of him. And at the same time he declared in terms that he did not confine himself to "the manner of connecting the safety devices to the generator" as it was obvious that the same could be varied without departing from the spirit of the invention. Any one of the separate feeding conductors of the defendants' arrangement leading from the generator to only one section of the working conductor and containing in it a safety device located near the generator is the equivalent of the long separate feeding conductor F electrically connected

with a single section of the working conductor, and a safety device for that section on the branch conductor, as shown in Fig. 3. The character of Schlesinger's invention as a new, meritorious and highly successful combination in the electric railway art, entitles claim 1 to a somewhat liberal application of the doctrine of equivalency. But it is not necessary to invoke such liberality. It is true that in the description it is stated that "when any section c is so cut out, it must be repaired," and "as soon as the repairs are made the safety device is manually adjusted to connect the section with the feeding-conductor." But with respect to this statement it should be observed, first, that it is made in that part of the description which deals with the arrangement illustrated in Fig. 1, and which statement is applicable to Fig. 2, in both of which the safety device is imperatively required by the structure therein shown to be interposed between the one continuous feeding conductor and a section of the working conductor, an arrangement with which this court has nothing to do in this case, and, secondly, that the precise place along the line of railway where repairs are to be made and the safety device manually adjusted is not of the essence of the invention as embodied and illustrated in Fig. 3, where separate feeding conductors are respectively in electrical connection with a single section of the working conductor as shown by the long feeding conductor F.

Letters patent No. 339,018 were granted to Schlesinger March 30, 1886, referred to as the indicator patent, the object of which was "to automatically locate a defective or faulty section after it has been cut out of the line-circuit" by providing "one or more indicator-boxes at the generator or other stations located along the line of way" and "for connecting each section or its safety device with a separate call or marked drop-plate in the indicator-box, so that when an excess of current passes to a section and operates its safety device to cut the section out of the line-circuit the safety device will also act to close or interrupt the circuit to the individual call or plate for said section in the indicator-box, and thereby automatically locate the faulty section." In the description of the patent in suit reference is made to the application for the indicator patent as follows:

"As soon as the cut-out or faulty section of conductor C is ascertained, which may be automatically done by means of an electrical indicator located at a central station and in circuit with all the safety devices of the line, as fully described in an application filed of an even date herewith, the repairs to the section are made," etc.

It is urged by the defendants that "this indicator patent, and the reference made to it in the patent in suit, furnish conclusive evidence that Schlesinger's alleged invention did not include any use of the safety device as indicators and certainly no use of them as indicators at the central station." So far as this suit is concerned I attach no importance to the indicator patent. It was not for nor did it include the combination of the patent in suit. . Schlesinger had a right under the latter patent to place his safety device in any separate feeding conductor electrically connected with only one section of the working conductor, in such separate feeding conductor either at or near the generator or at any other point between the generator and the branch

conductor, and that right could not be lost or affected by the fact that in placing it at or near the generator or central station it would serve as an electrical indicator. He was entitled to any additional use or benefit to be derived from such rightful change in location of the safety device. The fact that in the defendants' arrangement the safety devices serve as such indicators is wholly immaterial on the question of infringement. Their location at or near the generator does not destroy their function as safety devices.

Other matters have been urged by way of defence which though carefully considered it is not deemed necessary to discuss; as they seem clearly untenable either in law or in fact. On the whole I am satisfied that the combination of the defendants' arrangement or system infringes claim 1 of the patent in suit. It includes all the elements of the patented combination, coacting and interacting upon the same principle, performing the same function in substantially the same manner, and producing substantially the same result. Let a decree for the complainants in accordance with this opinion be prepared and submitted.